# Revised February 26, 2021

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
February 24, 2021
Lyle W. Cayce
Clerk

No. 20-30224

Grace Ranch, L.L.C.,

*Plaintiff—Appellee*,

*versus*

BP America Production Company; BHP Petroleum Americas, Incorporated, *formerly known as* BHP Billiton Petroleum (Americas), Incorporated,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:19-CV-1182

Before Wiener, Costa, and Willett, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

An unusual Louisiana law raises questions that would make for a tough Federal Courts exam. The statute allows citizen suits to enforce state conservation laws, but any injunction the citizen might obtain must be entered in favor of the Commissioner of Louisiana's Office of Conservation. La. Stat. Ann. § 30:16. The private plaintiff suing in this case contends

No. 20-30224

that this potential state involvement at the end of the litigation precludes diversity jurisdiction in federal court because there is no such jurisdiction when a State is a party. The district court disagreed and held that it had subject matter jurisdiction. Yet it remanded the case to state court anyway, concluding that *Burford* abstention[1] was appropriate because the state court offered a better forum for resolving unsettled questions about how the state law applies. With this appeal, another jurisdictional question is added to the mix: Does the general rule that state court remands are not appealable still include an exception for remands on abstention grounds? Resolution of these three issues—diversity jurisdiction; appellate jurisdiction; and *Burford* abstention—will determine where this case should be heard.

## I.

For many years, oil and gas operators in Louisiana disposed of their byproducts in unlined earthen pits, allowing toxic waste to seep into nearby soil and groundwater. In the mid-1980s, the Louisiana Department of Natural Resources banned this practice and ordered the closure of these pits. *See* LA. ADMIN. CODE tit. 43, pt. XIX, §§ 301–23. Louisiana landowners whose property oil and gas operators once leased for fuel extraction have spent decades seeking to recover for contamination caused by unlined pits.[2]

Few avenues of relief remain for landowners who came into possession of contaminated property after the pits were closed—so-called

---

[1] *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

[2] For background, see J. Michael Veron, *Oilfield Contamination Litigation in Louisiana: Property Rights on Trial*, 25 TUL. ENVTL. L.J. 1, 3–5 (2011); Loulan J. Pitre, Jr. & D'Ann R. Penner, *Legacy Litigation—What is Reasonable Behavior in the Oilfield?*, 28 TUL. ENVTL. L.J. 333, 345–47 (2015).

No. 20-30224

"legacy plaintiffs."[3]    The Supreme Court of Louisiana has held that subsequent purchasers of contaminated land cannot sue oil and gas operators in tort or contract for damage inflicted before the purchasers acquired the property. *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So.3d 246, 279–83 (La. 2011).

As a result, legacy plaintiffs shifted their efforts to enforcing the State's statutory remedies for contaminated lands. *Tureau v. BEPCO, L.P.*, 404 F. Supp. 3d 993, 997–98 (W.D. La. 2019). One of these laws tasks the Commissioner of Louisiana's Office of Conservation with taking oil and gas operators to court to enjoin violations of state conservation law. LA. STAT. ANN. § 30:14. If the Commissioner fails to do so after receiving notice from a party adversely affected by the violation, that party may sue in the Commissioner's place. *Id.* § 30:16. Several legacy plaintiffs have sued under section 30:16 to force compliance with Statewide Order 29–B, a Department of Natural Resources regulation that "require[s] the registration and closure of existing unlined oilfield pits" and that "various enumerated contaminants in the soil be remediated to certain standards." *Marin v. Exxon Mobil Corp.*, 48 So.3d 234, 240 (La. 2010); *see Tureau*, 404 F. Supp. 3d at 995.

Grace Ranch is one of these unlucky landowners. After acquiring property allegedly contaminated by BP America Production Company and BHP Petroleum Americas, Grace Ranch sued the oil and gas operators in tort and contract. *Grace Ranch, LLC v. BP Am. Prod. Co.*, 252 So.3d 546, 549 (La.

---

[3] *E.g.*, *Tureau v. BEPCO, L.P.*, 404 F. Supp. 3d 993, 997–98 (W.D. La. 2019); *see also Marin v. Exxon Mobil Corp.*, 48 So.3d 234, 238 n.1 (La. 2010) ("These types of actions are known as 'legacy litigation' because they often arise from operations conducted many decades ago, leaving an unwanted 'legacy' in the form of actual or alleged contamination." (citation omitted)).

3

No. 20-30224

Ct. App. 2018). Applying *Eagle Pipe*, Louisiana courts tossed the suit. *Id.* at 552, *writ denied*, 264 So.3d 450 (La. 2019).

In the face of this defeat, Grace Ranch tried another tack, notifying the Commissioner that BP and BHP were in violation of conservation regulations. After nearly two years, during which time the Commissioner declined to take any action, Grace Ranch filed suit against BP and BHP under section 30:16 in Louisiana state court. Styling the suit as "State of Louisiana *ex rel.* Grace Ranch, LLC v. [BP and BHP]," Grace Ranch sought an injunction ordering BP and BHP to remediate contamination on its property in compliance with state regulation.

Defendants removed the case to federal court, asserting jurisdiction based on diversity of citizenship. Grace Ranch agrees that it is a citizen of Louisiana and that BP and BHP are both citizens of Texas. Yet Grace Ranch opposed removal, arguing that Louisiana is the real party in interest to the litigation, which would mean that this is not a case between "citizens of different States." 28 U.S.C. § 1332(a)(1). In the alternative, Grace Ranch urged the federal court to abstain from exercising jurisdiction under *Burford*.

A magistrate judge found both arguments unpersuasive and recommended that the case continue in federal court. The district court partially disagreed, denying Grace Ranch's motion to remand for lack of diversity jurisdiction but concluding that the federal court should abstain under *Burford*.

BP and BHP appealed. Grace Ranch then filed a motion to dismiss the appeal for lack of jurisdiction, continuing to press its view that the State's involvement in this case defeats diversity jurisdiction.

4

No. 20-30224

II.

We start with the issue in the motion to dismiss: Grace Ranch's argument that this case had no business being in federal court in the first place.

A defendant sued in state court may remove the suit to federal court so long as the federal tribunal would have had original jurisdiction over the action. 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over disputes between citizens of different states when more than $75,000 is at stake. *Id.* § 1332(a)(1). Looking only at the private parties in this case, the requirement of complete diversity is met. One side of the "*v.*" has a Louisiana citizen; the other side has Texas citizens.

But when a State is party to a lawsuit, or is the real party in interest, diversity of citizenship does not exist. That is because the diversity statute vests federal courts with jurisdiction when the suit is between "citizens of different States," not when the State is one of the parties.[4] 28 U.S.C. § 1332(a)(1); *Louisiana v. Union Oil Co. of Cal.*, 458 F.3d 364, 366 (5th Cir.

---

[4] This longstanding rule is a matter of statute. *See Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894). Article III allows federal jurisdiction over suits "between a State and Citizens of another State." U.S. CONST. art. III, § 2. And while the Eleventh Amendment bars the exercise of such jurisdiction when the State is a defendant, it does nothing to bar federal jurisdiction when a State sues a citizen of another State. Indeed, in the Virginia Ratifying Convention, James Madison and John Marshall argued that this Article III grant extended only to cases "when the [S]tate was a plaintiff," not when the State was a defendant (a view soon made explicit with the adoption of the Eleventh Amendment). William A. Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather Than a Prohibition Against Jurisdiction*, 35 STAN. L. REV. 1033, 1049 & n.68 (1983) (citing 3 DEBATES ON THE FEDERAL CONSTITUTION 533, 555–56 (J. Elliot 2d ed. 1891)). But Congress has not authorized federal jurisdiction when a State sues a citizen of another State, so we do not have it. *Sheldon v. Sill*, 49 U.S. 441, 449 (1850) (holding that federal district courts can only exercise the jurisdiction granted to them by both Article III and Congress).

2006) ("[A] state is not a citizen for purposes of diversity jurisdiction." (citation and quotation marks omitted)). Grace Ranch argues that Louisiana is a party to this litigation, pointing out that its section 30:16 suit is a vehicle for enforcing state conservation law in the wake of the Commissioner's inaction and that an injunction can only be entered in the Commissioner's name.

The argument that the State is a party requires us to explore more fully the Louisiana conservation statute we have mentioned. Section 30:16 authorizes citizen suits to enforce state conservation law when the Commissioner declines to act. That seems simple enough. The rub is what happens if the private citizen prevails: "If the court holds that injunctive relief should be granted, the commissioner shall be made a party and shall be substituted for the person who brought the suit and the injunction shall be issued as if the commissioner had at all times been the complaining party." LA. STAT. ANN. § 30:16. Grace Ranch maintains that Louisiana must be party to a section 30:16 suit all along if an injunction can only be issued in the name of a Louisiana state official. However intuitively appealing, this argument does not withstand scrutiny.[5]

## A.

Despite Grace Ranch's listing of Louisiana in the style of the case, the State is not a proper party because it has not authorized landowners to sue in its name. Though the state legislature "can authorize non-state officers or

---

[5] Judges in the Western District of Louisiana have addressed this issue a number of times, always concluding that the State is not a party in section 30:16 suits. *See Tureau*, 404 F. Supp. 3d at 995; *Guilbeau v. BEPCO, L.P.*, 2019 WL 3801647, at *1 (W.D. La. Aug. 12, 2019); *Watson v. Arkoma Dev., LLC*, 2018 WL 1311177, at *1 (W.D. La. Mar. 13, 2018); *see also Conner v. Chevron, USA Inc.*, 2020 WL 2858931, at *3 (W.D. La. June 2, 2020) (magistrate's report and recommendation), *stayed by* 2020 WL 3129071 (W.D. La. June 11, 2020) (stayed pending resolution of this case).

entities to sue to protect the State's interests in specific situations," not everyone can initiate lawsuits in the State's name. *Par. of Plaquemines v. Total Petrochemical & Refining USA, Inc.*, 64 F. Supp. 3d 872, 888 (E.D. La. 2014). "Louisiana law does not brook self-appointed interlopers who institute legal action on behalf of the State without the legal authority to do so." *Id.* at 889. Who has the authority to sue on the State's behalf? Those whom the State empowers through a specific legislative grant. *Id.* at 888–89.

Some Louisiana laws expressly provide that entities may sue for the State. *See, e.g.*, *Williams v. Belle of Orleans, L.L.C.*, 890 So.2d 670, 675 (La. Ct. App. 2004) (concluding that "express provisions" of state law empowered municipal tax assessor to "bring suit to protect the state's interest"); *Union Oil*, 458 F.3d at 367 (noting that statute allowed parish school board to hire attorneys "on the part of the State of Louisiana . . . to recover [damages] for the state" (quoting LA. STAT. ANN. § 41:961) (emphasis omitted)). Others outline litigation authority that, when viewed in context, encompasses suit on the State's behalf. *Compare Par. of Plaquemines*, 64 F. Supp. 3d at 890–91 (holding that statute granted parishes power to sue on State's behalf by authorizing recovery for violations of state permits through "state-local partnership"), *with In re La. Riverboat Gaming Comm'n*, 659 So.2d 775, 782–83 (La. Ct. App. 1995) (using statutory text to determine that legislature did not authorize parish district attorney to sue for the State), *and La. Dep't of Wildlife & Fisheries v. Gulfport Energy Corp.*, 125 So.3d 468, 471 (La. Ct. App. 2012) (rejecting state agency's argument that "various statutes . . . show it has implied authority to bring this suit on behalf of the state"). Section 30:16 does neither.

A private party suing under section 30:16 does so on its own behalf. The statute authorizes a "person in interest adversely affected" by a violation of state conservation law to "bring suit to prevent any or further violations." LA. STAT. ANN. § 30:16. Nowhere does the text signal that

section 30:16 plaintiffs vindicate "the State's interest" through their suits or that these plaintiffs have been deputized to act "on the part of" the State.[6] Nor does the citizen-suit framework of section 30:16 evoke the kind of "state-local partnership" that allows parishes to prosecute coastal permit violators for the State. *See Par. of Plaquemines*, 64 F. Supp. 3d at 891. Section 30:16 has a more limited purpose: it allows landowners like Grace Ranch to sue in their own names when the Commissioner has failed to act.

## B.

Grace Ranch's real-party-in-interest argument for state involvement fares no better because Louisiana has only a general interest in the outcome of this suit. "In determining diversity jurisdiction, the citizenship of the real parties in interest is determinative, and the citizenship of nominal or formal parties who have no real interest in the dispute before the court may be disregarded." *Wolff v. Wolff*, 768 F.2d 642, 645 (5th Cir. 1985) (footnote omitted). The State has a real interest if "the relief sought is that which inures to it alone" so that a judgment for the plaintiff "will effectively operate" in the State's favor. *Mo., Kan., & Tex. Ry. Co. v. Hickman*, 183 U.S. 53, 59 (1901) (*Missouri Railway*). Likewise, the State is a key player if the court cannot "reach a final judgment consistent with equity and good conscience and fair to [plaintiffs]" in the State's absence. *See Acosta v. Master Maint. & Constr. Inc.*, 452 F.3d 373, 379 (5th Cir. 2006). But the State is just a nominal party if its only stake in the suit is a "general government

---

[6] Other statutes, by contrast, expressly reference the State's interest. *See Williams*, 890 So.2d at 673 ("The assessor shall bring suit, when *necessary to protect the interest of the state* . . . ." (quoting La. Stat. Ann. § 47:1998C) (emphasis added)); *Union Oil*, 458 F.3d at 367 ("The school boards of the various parishes of the state may contract with and employ *on the part of the State of Louisiana*, attorneys at law, *to recover for the state* . . . ." (quoting La. Stat. Ann. § 41:961)).

interest" in "secur[ing] compliance with the law." *Missouri Railway*, 183 U.S. at 60. That is the case here.

Louisiana's interest in environmental regulation does not make the State a real party in interest to Grace Ranch's section 30:16 suit. Otherwise, "the state would be a party in interest in all litigation," because the State always has an interest in enforcing its laws. *Id.* At bottom, Grace Ranch asserts its rights as a landowner, endeavoring through section 30:16 to compel BP and BHP to remediate its contaminated land. Although compensatory damages are not available under section 30:16, an injunction requiring remediation would nonetheless provide the plaintiff with a substantial economic benefit. Grace Ranch thus has "a pecuniary interest in the outcome of [the] action." *Watson*, 2018 WL 1311208, at *3; *see Guilbeau*, 2018 WL 4869389, at *3. The State does not. *Cf. Union Oil*, 458 F.3d at 367 ("Because the State is the fee title owner of the . . . lands involved in this law suit, the State has more than a 'nominal' interest in property it owns."). Grace Ranch remains "the party to whom alone the relief sought inures, and in whose favor a decree for the plaintiff will effectively operate." *Missouri Railway*, 183 U.S. at 61.

Louisiana, moreover, has no real interest in this litigation because the district court could fairly enter final judgment in its absence. The State's involvement in this suit is contingent on the court's decision to grant an injunction. Courts can resolve section 30:16 litigation without enjoining the defendant, either because an injunction is unwarranted or because an affirmative defense bars relief (as defendants argue here). In those cases, the State never joins the suit and a final judgment *must* be entered in its absence.

Grace Ranch insists that diversity jurisdiction is missing at every stage of a section 30:16 suit. But its strongest point depends on a possible outcome at the very final stage of the suit: the possibility that the federal court will

issue an injunction that substitutes the Commissioner for the original plaintiff. Perhaps such a last-minute entrance by the Commissioner would defeat diversity jurisdiction. It is hard to see, however, why that contingency would affect jurisdiction now, when it is far from certain that the Commissioner will ever enter the case. And it would be highly inefficient to remand the case to state court only at the end stage of the lawsuit when the injunction might issue. That efficiency concern underlies the "long-established general rule . . . that jurisdictional facts are determined at the time of removal, and consequently post-removal events do not affect that properly established jurisdiction." [7] *Louisiana v. Am. Nat'l Prop. Cas. Co.*, 746 F.3d 633, 636 (5th Cir. 2014). That rule controls here. Sensing the problem with a remand at the end stage of the case, Grace Ranch asserts that there is no diversity at the time of removal because a section 30:16 injunction "shall be issued *as if the commissioner had at all times been the complaining party.*" § 30:16 (emphasis added). This circular argument cannot be squared with the reality that the Commissioner only makes a late appearance in a successful section 30:16 suit.

Because Louisiana is not a proper party or real party in interest, this court has subject matter jurisdiction over Grace Ranch's suit.

---

[7] To be sure, in some situations, federal courts lack jurisdiction over claims involving nondiverse parties added to the litigation after filing. *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978) (holding no diversity jurisdiction over claim by plaintiff against third-party defendant because both were Iowa citizens). But under the "prevailing rule," diversity jurisdiction is determined at the time of filing (or removal). 13E Charles Alan Wright et al., Federal Practice and Procedure § 3608 (3d ed. 2020) (footnotes omitted). "[A] change of parties, by addition, substitution, or elimination . . . will not divest the court of diversity jurisdiction if the nature of the action remains the same, if the court finds that no collusion is involved in the conduct of the parties, or if the change is not an obvious attempt to evade the rule of complete diversity." *Id.* (footnotes omitted).

No. 20-30224

### III.

Having determined that the district court had diversity jurisdiction, we next consider whether this court has appellate jurisdiction to review the abstention ruling. The decision to abstain resulted in a remand to state court. And Congress has directed that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal." 28 U.S.C. § 1447(d).

Read on its own, section 1447(d) sounds like an absolute bar on appeals from remand orders. The Supreme Court has held, however, that section 1447(d) only prohibits appellate review of certain types of remand orders: the kind specified in neighboring subsection 1447(c). *Thermtron Prods., Inc. v. Hermansdorfer*, 423 U.S. 336, 345–46 (1976) (holding that sections 1447(c) and (d) must be read together).[8] Until 1996, section 1447(c) covered remands "on the basis of any defect in removal procedure" (those had to be raised within 30 days) or because "the district court lacks subject matter jurisdiction" (as a jurisdictional defect, those could be raised at any time). 28 U.S.C. § 1447(c) (1996). Reasoning that an "abstention-based remand order" fit neither of those categories, the Supreme Court held that such an order could be reviewed on appeal. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996).

---

[8] About a decade ago, four Justices expressed disagreement with *Thermtron*'s premise that sections 1447(c) and (d) must be read together. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 642 (2009) (Stevens, J., concurring); *id.* at 642–43 (Scalia, J., concurring); *id.* at 644–45 (Breyer, J., joined by Souter, J., concurring). But, noting that no party asked the court to reconsider *Thermtron*, *Carlsbad* followed the precedent that "§ 1447(d) must be read *in pari materia* with § 1447(c), thus limiting the remands barred from appellate review by § 1447(d) to those that are based on a ground specified in § 1447(c)." *Carlsbad*, 556 U.S. at 638 & n.*. We, of course, have no authority to overrule the Supreme Court's holding that section 1447(d)'s appeals bar extends only to remand orders discussed in the preceding section of the law.

No. 20-30224

The wrinkle is that, since *Quackenbush*, the wording of section 1447(c) has changed. Instead of "any defect in removal procedure," the statute now applies the time limit to remands based on "any defect other than lack of subject matter jurisdiction." Pub. L. No. 104-219, § 1, 110 Stat. 3022 (1996) (codified at 28 U.S.C. § 1447(c) (2018)). And as it did before, section 1447(c) still discusses remands when the "district court lacks subject matter jurisdiction." *Id.* So if "defect" is read broadly to mean any nonjurisdictional reason for remand, then amended section 1447(c) would cover remands for all jurisdictional and nonjurisdictional reasons—that is, every remand (including abstention-based remands). *Snapper, Inc. v. Redan*, 171 F.3d 1249, 1259 (11th Cir. 1999) (acknowledging but rejecting this argument). And if section 1447(c) covers every remand, then section 1447(d) would bar appellate review of every remand. *Thermtron Prods.*, 423 U.S. at 345–46.

We have not, however, signed on to that broad reading of "defect" in the new section 1447(c). We continue to review abstention-based remands, "impliedly reject[ing] the notion that the [1996] amendment abrogated *Quackenbush*." *Watson v. City of Allen*, 821 F.3d 634, 639 & n.3 (5th Cir. 2016) (citing *Wallace v. La. Citizens Prop. Ins. Corp.*, 444 F.3d 697, 700–01 (5th Cir. 2006)). The circuits that have directly addressed the impact of the section 1447(c) amendment uniformly reject the view that "defect" includes all nonjurisdictional remands. *Snapper*, 171 F.3d at 1259; *Kamm v. ITEX Corp.*, 568 F.3d 752, 756–57 (9th Cir. 2009); *Cleveland Hous. Renewal Proj. v. Deutsche Bank Trust Co.*, 621 F.3d 554, 558–59 (6th Cir. 2010); *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 636 F.3d 971, 975 (8th Cir. 2011).

Addressing the issue head-on for the first time, we agree with the consensus view. Starting where we must, the ordinary meaning of defect is "deficiency." *Snapper*, 171 F.3d at 1253 (citing dictionary definitions). Yet

12

a federal court's decision to abstain does not reflect anything deficient—that is, lacking—with the removal; abstention instead involves a discretionary assessment of how hearing a case would impact the delicate state/federal balance. *Id.* If Congress intended to require that any nonjurisdictional basis for removal be raised within 30 days of removal, it would have been clearer to say "any remandable ground," *id.*, or more simply, "any basis" or "any ground," *Kamm*, 568 F.3d at 755. We must give effect to Congress's choice to retain the "narrower term 'defect.'" *Id.*[9]

Section 1447(c)'s 30-day requirement for raising any defect with removal is another reason it is difficult to swallow an interpretation of "defect" that would include any nonjurisdictional rationale. One of the most common nonjurisdictional remands is sending state law claims, in federal court via supplemental jurisdiction, back to state court. Yet the reasons for remanding supplemental state claims, such as the eventual dismissal of the federal claims (*see* 28 U.S.C. § 1367(c)(3)), "will almost always arise only after the expiration of thirty days." *Snapper*, 171 F.3d at 1253–54. The expansive reading of "defect" would thus effectively eliminate a basis for remand that Congress has long allowed. *Id.* The better reading excludes

---

[9] Interpreting "defect" to still require some sort of statutory deficiency with removal does not render the 1996 amendment meaningless. By getting rid of the defect "in removal *procedure*" language, the amendment extends the timeliness requirement to remands based on *substantive* statutory deficiencies such as removal of a diversity case by a defendant that is a citizen of the forum state. *See Kamm*, 568 F.3d at 756 (citing *Lively v. Wild Oats Mkts., Inc.*, 456 F.3d 933, 939 (9th Cir. 2006)) (emphasis added); *see generally Snapper*, 171 F.3d at 1257–58 (chronicling how the 1996 amendment's deletion of the "in removal procedure" language eliminated a circuit split that had developed about whether section 1447(c) included remands for violation of the forum state defendant rule). Another example of a substantive defect with removal is the statutory bar on removing state-law workers' compensation claims. *See Kamm*, 568 F.3d at 755–56 (citing 28 U.S.C. 1445(c)).

No. 20-30224

supplemental jurisdiction remands—which, like abstention rulings, are discretionary decisions animated by federalism concerns (*see* 28 U.S.C. § 1367(c)(1))—from the class of "defects" that must be raised within 30 days of removal.

The clincher is that the Supreme Court has held, in a case postdating the 1996 amendment, that there is appellate jurisdiction over supplemental jurisdiction remands. To be sure, the issue in that case was whether a remand under the supplemental jurisdiction statute was a remand "based on a lack of 'subject matter jurisdiction'" within the meaning of section 1447(c). *Carlsbad*, 556 U.S. at 638 (holding that a supplemental jurisdiction remand is not jurisdictional but rather a discretionary decision to remand claims over which the district court does have jurisdiction). But if section 1447(c) now covered all remand orders, whether remands of supplemental state law claims fits into the jurisdictional or nonjurisdictional box would not matter. *Carlsbad*'s holding that there is appellate jurisdiction over remands of supplemental state claims is thus incompatible with the view that section 1447(c) now covers all remands. *See Cleveland Hous. Renewal Proj.*, 621 F.3d at 558–59 (concluding that *Carlsbad* rejects the argument that section 1447(c) includes any remand order). Indeed, no party or Justice argued that a remand of supplemental state claims was one based on a removal "defect."[10]

Making explicit what was previously implicit in our caselaw, a discretionary remand such as one on abstention grounds does not involve a removal "defect" within the meaning of section 1447(c). We thus have jurisdiction to review the district court's abstention-based remand order.

---

[10] The four Justices who wrote separately only raised doubts about whether section 1447(d) depends on the scope of section 1447(c). *See supra* note 8.

14

No. 20-30224

## IV.

Having determined that there is both subject-matter and appellate jurisdiction over this case, we turn to abstention. Federal courts have a "virtually unflagging obligation" to exercise our jurisdiction. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). We may only abstain in the rare instances when hearing a case within our equity jurisdiction would "be prejudicial to the public interest." *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) (citation omitted). Grace Ranch argues that this is one of those suits requiring a departure from our ordinary duty to exercise the jurisdiction that the Constitution and Congress grant us.

One of two abstention doctrines that arose from federal court challenges to Texas Railroad Commission rulings,[11] *Burford* abstention allows federal courts to avoid entanglement with state efforts to implement important policy programs:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the

---

[11] *Pullman* abstention is the other. *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). It actually involved railroads, as the state agency had required sleeping cars to be staffed by white conductors. *Id.* *Burford* involves the Railroad Commission's more influential, though less obvious, responsibility: regulating the Texas oil and gas industry. 319 U.S. at 317–18. During the heyday of the East Texas Oil Field, the Railroad Commission's efforts to limit overproduction—at one point, some barrels of oil were selling for two cents—led to numerous disputes between the agency and courts. *See* Daniel Yergin, The Prize: The Epic Quest for Money, Oil, and Power 244–52 (1992) (detailing the history of the oil field, including disputes between the Commission and the courts). *Burford* was one of them. 319 U.S. at 317.

15

No. 20-30224

exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989) (*NOPSI*) (cleaned up). The power to abstain under *Burford* charges courts with a careful balancing of state and federal interests, but one that "only rarely favors abstention." *Quackenbush*, 517 U.S. at 728.

This court has distilled the high court's guidance into five factors that steer our analysis of whether *Burford* abstention is warranted. *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993). These factors are:

> (1) whether the cause of action arises under federal or state law;
> (2) whether the case requires inquiry into unsettled issues of state law or into local facts;
> (3) the importance of the state interest involved;
> (4) the state's need for a coherent policy in that area; and
> (5) the presence of a special state forum for judicial review.

*Aransas Proj. v. Shaw*, 775 F.3d 641, 649 (5th Cir. 2014) (quoting *Wilson*, 8 F.3d at 314). We must also keep in mind that "*Burford* abstention is disfavored as an abdication of federal jurisdiction." *Id.* at 653.[12]

Disagreeing with the magistrate judge's recommendation, the district court concluded that abstention was warranted. It outlined its reasoning in

---

[12] Commentators have noted that *Burford* has "produced few if any progeny in the Supreme Court, and attempts to apply [it] in the lower courts have frequently spawned confusion." RICHARD FALLON JR. ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1120 (7th ed. 2015); *see also* 17A WRIGHT ET AL., *supra*, § 4244 (assessing that many lower court cases "do not seem to fit comfortably within any of the areas in which the Supreme Court has recognized *Burford*-type abstention").

just one paragraph,[13] pointing to unsettled questions of Louisiana law, the State's interest in "legacy litigation and the remediation of contaminated land," and the need for "the state judicial system to fashion a coherent state policy concerning the applicability of [section 30:16]." We review the district court's decision to abstain under *Burford* for abuse of discretion. *Stratta v. Roe*, 961 F.3d 340, 356 (5th Cir. 2020). But this discretion is narrowly confined. We "review de novo whether the requirements of a particular abstention doctrine are satisfied." *Id.* (quoting *Aransas Proj.*, 775 F.3d at 648). And "[b]ecause the exercise of discretion must fit within the specific limits prescribed by the particular abstention doctrine invoked, a court necessarily abuses its discretion when it abstains outside of the doctrine's strictures." *Id.* (cleaned up).

### A.

### 1.

Beginning with the first factor, Grace Ranch asserts a state-law claim under section 30:16. That far from settles the abstention question. After all, federal courts hear state law claims all the time. *See* 28 U.S.C. § 1332. But it does get the ball rolling in the direction of abstention. *Aransas Proj.*, 775 F.3d at 649.

### 2.

The second factor tends to favor abstention as well. The state law claims involve an unsettled question of Louisiana law: whether landowners

---

[13] Defendants argue that the district court's decision to abstain should be reversed based on its brevity alone. We disagree because it did provide reasons to support its remand order. But in its quick analysis, the district court highlighted aspects of this case that only facially favor abstention. Once we dig deeper, we can see that they do not carry as much weight as the district court supposed.

can sue under section 30:16 for past violations of conservation law. *See Glob. Mktg. Sols., L.L.C. v. Blue Mill Farms, Inc.*, 267 So.3d 96, 101 (La. Ct. App. 2018) (interpreting complaint to allege ongoing, rather than past, violations under section 30:16); *id.* at 102 (Guidry, J., dissenting) (arguing that past violations "do not state a cause of action" under section 30:16).

Defendants counter that, even though this question of past versus present violations looms on the horizon, it is far from certain that this case will require inquiry into that unsettled state-law issue. They offer affirmative defenses—prescription and res judicata—that could cut off the district court's inquiry before it reaches section 30:16's scope. It may not be so easy for the district court to stay above the fray, however, because these affirmative defenses may themselves implicate unsettled state-law issues. Louisiana courts have not addressed whether prescription bars section 30:16 suits by subsequent purchasers like Grace Ranch whose damages claims have been dismissed in prior litigation. *See Eagle Pipe*, 79 So.3d at 276 & n.71; *Marin*, 48 So.3d at 256 n.18. Those defenses, however, would presumably not affect the State's ability to bring future suits. As a result, while this factor still supports abstention, the uncertainty about whether the district court will actually need to resolve the most significant unsettled state-law question may limit its weight.

Although the risk that the federal court will confront an unsettled state-law issue builds more momentum in favor of abstention, it does not on its own justify a federal court's refusal to hear the case. *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 272 (5th Cir. 2009) (declining to abstain just because an "action arises under state law and requires an inquiry into an unsettled state-law issue"); *see also Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 145 F.3d 238, 242 (5th Cir. 1998); *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 589–90 (5th Cir. 1994). We frequently decide unsettled questions of state law. *See, e.g., Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 229 (5th

Cir. 2020) (making *Erie* guess on question of California employment law); *Chevron Oronite Co. v. Jacobs Field Servs. N. Am., Inc.*, 951 F.3d 219, 234 (5th Cir. 2020) (Louisiana contract law); *Martinez v. Walgreen Co.*, 935 F.3d 396, 404 (5th Cir. 2019) (Texas tort law). And when the question of state law is especially important or difficult to resolve, we can ask a state court to decide that issue while still retaining federal jurisdiction over the case as a whole. *McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 202–03 (5th Cir. 2020).

Indeed, the certification procedure arose in response to our court being too quick to abstain. The same year it decided *Burford*, the Supreme Court rebuked us for "misusing the abstention doctrine as a means to avoid deciding difficult, unsettled questions of state law." Rebecca A. Cochran, *Federal Court Certification of Questions of State Law to State Courts: A Theoretical and Empirical Study*, 29 J. LEGIS. 157, 164 (2003) (citing *Meredith v. City of Winter Haven*, 320 U.S. 228, 234–35 (1943)). The Court cautioned that "the difficulties of ascertaining what the state courts may hereafter determine the state law to be do not in themselves afford a sufficient ground for a federal court to decline to exercise its jurisdiction to decide a case which is properly brought to it for decision." *Meredith*, 320 U.S. at 234. Against this backdrop, the Fifth Circuit innovated the practice of certifying state-law questions to state supreme courts. Cochran, *supra*, at 165–66; *see Suns Ins. Off., Ltd. v. Clay*, 319 F.2d 505, 507–08 (5th Cir. 1963). "[T]hough it may now be regarded as settled that the mere difficulty in ascertaining state law does not justify abstention in private litigation, it is enough to permit certification." 17A WRIGHT ET AL., *supra*, § 4246.[14]

---

[14] No party is asking for certification here, so we do not take a view on whether it would be appropriate. Rather, we draw on this history to stress that abstention is not warranted any time difficult issues of state law vex the federal courts.

No. 20-30224

Abstaining rather than certifying is even less defensible when, as here, it is not certain that the federal court will have to decide the unsettled question of state law. If, in the end, the court cannot escape an unresolved state-law question, certification offers a neat solution. But if the issue never arises, the federal court has not hastily abdicated its jurisdiction.

As the certification procedure shows, something more than a reluctance to decide questions of state law in the first instance is needed for a federal court to decline to exercise the jurisdiction Congress assigned it. Kade N. Olsen, Note, Burford *Abstention and Judicial Policymaking*, 88 N.Y.U. L. REV. 763, 798 (2013). In *Burford* itself, federal courts threatened to usurp the role of a specialized state tribunal tasked with "shaping the policy of regulation" and evaluating a state commission's individual permitting orders for "reasonableness." 319 U.S. at 326–28. This meant that "[c]onflicts in the interpretation of state law, dangerous to the success of state policies, [were] almost certain to result" from federal court intervention. *Id.* at 334. Following *Burford*'s logic, we have found abstention proper when our exercise of jurisdiction "would involve the federal court in an open-ended 'fairness' inquiry into predominantly local matters," *Wilson*, 8 F.3d at 315, or allow the court to second-guess the policy decisions of state regulators, *Sierra Club v. City of San Antonio*, 112 F.3d 789, 796 (5th Cir. 1997). The remaining factors will determine whether there is something here like those concerns that animated *Burford*.

3.

The third factor favors abstention because the State has a strong interest in remediating contaminated lands. This interest is "enshrined in the Constitution of Louisiana." *Tureau*, 404 F. Supp. 3d at 1002; *see* LA. STAT. ANN. § 30:29A (declaring that the state constitution mandates the legislature "set forth procedures to ensure that damage to the environment

is remediated to a standard that protects the public interest" (citing LA. CONST. art. IX, § 1)). But like the previous factor, this lends only modest support to Grace Ranch's case for abstention.

*Burford* abstention is warranted when the state interests at stake are "paramount." *Quackenbush*, 517 U.S. at 728. Such is the case when a state administrative scheme guards an "over-all plan of regulation . . . of vital interest to the general public" from federal interference. *Burford*, 319 U.S. at 324. We have found abstention improper, however, when countervailing federal policies undermine the primacy of the state's interest, *Aransas Proj.*, 775 F.3d at 650–51, or when the state interests involved are not threatened by the limited relief sought, *Stratta*, 961 F.3d at 358. Even powerful state interests, therefore, will not always justify abstention. *See C.S. Gaidry, Inc. v. Union Oil Co. of Cal.*, 2009 WL 2765814, at \*7 (E.D. La. Aug. 27, 2009) (declining to abstain even though "oilfield remediation is an issue of importance to the State of Louisiana"). The weight that we give to the state interests at stake is properly informed by the next factor, which focuses on the potential for federal disruption of a coherent state policy.

4.

With this fourth factor, Grace Ranch hits a roadblock. It does not show that federal resolution of this suit would disrupt Louisiana's efforts to establish a coherent policy for the remediation of contaminated lands. We do not doubt that "states have a strong need for coherent policy in the regulation of finite natural resources." *Aransas Proj.*, 775 F.3d at 651 (citing *Burford*, 318 U.S. at 319, 325). But "the need for coherence is not alone a reason for abstention." *Id.* This factor is "intended to avoid recurring and confusing federal intervention in an ongoing state scheme." *Wilson*, 8 F.3d at 315. That kind of worrisome meddling is not a concern here.

No. 20-30224

The magistrate judge recognized that this case does not feature the type of "complex state administrative processes" that *Burford* abstention aims to "protect[] . . . from undue federal interference." *NOPSI*, 491 U.S. at 362. The district court, however, decided to abstain so that state courts could "fashion a coherent state policy concerning the applicability of [section 30:16]." Grace Ranch picks up on this point, protesting that a federal court ruling on its section 30:16 claim could curtail the Commissioner's enforcement authority under section 30:14. But the ability to bring a lawsuit in the Commissioner's name is not a complex administrative process. Sections 30:16 and 30:14 do not call upon courts to review the decisions of state regulators as the "working partners" of an administrative agency. *Cf. Burford*, 319 U.S. at 326. Nor do they facilitate state efforts to centralize control over highly integrated regulatory actions. *Cf. id.* at 324–25; *Sierra Club*, 112 F.3d at 794–95. These statutes authorize litigation, not administration.[15]

Even if we were to assume that a suit by the Commissioner under section 30:14 represents a complex administrative process, a federal court would not disrupt this process by entering the relief that Grace Ranch seeks. *See Stratta*, 961 F.3d at 358 (holding abstention unwarranted when "the state concerns that are implicated are not overriding in light of the remedy sought"). Grace Ranch wants nothing more than an injunction against BP and BHP under section 30:16. A federal district court deciding whether to enjoin the defendants would apply Louisiana law and may have to reach the

---

[15] We need not decide whether federal court intervention would disrupt the administrative processes described in La. Stat. Ann. § 30:29. Under that section, the Commissioner works with the court to develop a feasible plan for remediating contaminated land once a defendant is found liable for environmental damage. *See* La. Stat. Ann. § 30:29C. Grace Ranch has disavowed any connection between its request for injunctive relief and the procedures outlined in section 30:29.

unsettled question of whether relief is available for past violations. But however the federal court rules, the Commissioner will still be able to bring lawsuits to enforce Louisiana's conservation laws. Unlike the interdependent schemes that *Burford* protects from federal judicial intervention, each section 30:16 suit stands or falls on its own. Even from a precedential standpoint, a federal court ruling in this case could not restrict the scope of the Commissioner's authority when the Commissioner sues under the conservation laws; we are not the last word on questions of state law. *See Cedarholley Inv., LLC v. Pitre*, 209 So.3d 850, 853 n.3 (La. Ct. App. 2016) ("The federal district court's '*Erie*-guess' is not binding authority regarding Louisiana law.").[16]

Contrast the lack of an impact this case will have on the Commissioner's authority with the potential disruption of a state regulatory scheme that compelled this court to abstain in *Sierra Club*. There, the concern was that a federal court ruling on an Endangered Species Act claim would interfere with the "comprehensive regulatory scheme" through which

---

[16] Similar to the reasoning of the district court in this case, another district court decided to abstain from two section 30:16 suits based on a concern about inconsistent judicial rulings:

> "[T]here are § 30:16 claims before both state and federal courts throughout Louisiana. There is a strong possibility that a ruling by [the federal district court] could conflict with rulings in other courts. Such inconsistencies would create an uncertain, and thus unequitable, system for determining who bears the responsibility for remediation of contaminated land until the Louisiana Supreme Court ultimately ruled on the matter."

*Tureau*, 404 F. Supp. at 1002; *Guilbeau*, 2019 WL 3801647, at *7. The concern that state and federal courts might inconsistently resolve important legal questions underlies the second factor, *see Wilson*, 8 F.3d at 315, but does not support the fourth factor. As explained above, the fourth factor is concerned with protecting an interdependent state regulatory scheme from federal court intervention.

Texas governed an aquifer. 112 F.3d at 794. The agency overseeing the aquifer controlled the withdrawal of water through a permit system. *Id.* A federal court injunction regulating water use would have directly conflicted with the water withdrawals set by the state agency, *id.* at 794–95, just as a federal court ruling concerning the drilling rights of one landowner would have conflicted with the need, "based on geologic realities, [for] each oil and gas field [to] be regulated as a unit for conservation purposes" in *Burford.* 319 U.S. at 319. Unlike rulings affecting an aquifer or oil field, a ruling concerning Grace Ranch's property will not "necessarily affect[] other parties" within "a single integrated system." *Sierra Club*, 112 F.3d at 794–95 (citation omitted).

Defendants go too far in saying that abstention applies only when there is a parallel state administrative proceeding, such as the Texas Railroad Commission rulings in *Burford*. But when there is not a parallel proceeding, there typically is at least the "potential for conflict with state regulatory law or policy." *NOPSI*, 491 U.S. at 362 (citation omitted); *id.* (observing that, even in such cases, abstention might not be warranted). For the reasons we have explained, we do not see that the exercise of federal jurisdiction over this case poses that risk. Whatever the result of Grace Ranch's case, the Commissioner will remain free to enforce the same law for other land in the state.

5.

The fifth factor also weighs against abstention. Louisiana provides no special forum for judicial review. Instead, section 30:16 incorporates the venue provisions of section 30:14 authorizing the Commissioner to sue "in the parish of the residence of any one of the defendants or in the parish where the violation is alleged to have occurred or is threatened." LA. STAT. ANN. § 30:14.

This regime is thus unlike *Burford*, in which Texas allowed judicial review of Railroad Commission orders only in the state district courts sitting in Austin.  319 U.S. at 326.  That indicator of a strong state interest in uniformity is lacking here.  *Cf. id.* (noting that concentrating judicial review in one forum aimed to "prevent the confusion of multiple review of the same general issues").  Louisiana has allowed these conservation suits to be brought, like most lawsuits, anywhere in the State even though that may result in conflicting caselaw before an issue reaches the state supreme court.  Louisiana's treating section 30:16 suits like regular litigation for venue purposes suggests there is not a special need for centralized decisionmaking that federal court intervention might undermine.

### B.

So the first three factors favor abstention to varying degrees and the last two counsel against it.  Where does that leave us?

The argument for abstention boils down to this: the case involves state law claims, with the potential need to decide an unsettled question of state law, in an area of general importance to the State.  That is not nothing on the federalism side of the scale.  But nor is it enough to have us refrain from our general duty to exercise the jurisdiction Congress has given us.

Grace Ranch cites no decision to abstain in which only the first three factors favored abstention.  And it would not be unusual for a case to present those three factors.  Section 30:16 has some peculiarities, such as the inclusion of the state official in any injunction, but there are many laws that both the government and private parties can enforce.  *See generally* Zachary D. Clopton, *Redundant Public-Private Enforcement*, 69 Vand. L. Rev. 285, 294–99 (2016) (discussing examples in antitrust, securities, civil rights, labor, employment, and consumer protection law).  A private party pursuing state consumer protection or antitrust claims removed to federal court on diversity

grounds would often be able to make the same abstention argument Grace Ranch advances: the case might require the federal court to decide unsettled state law questions, resulting in caselaw (not binding in state court) that weakens the State's enforcement power when it later enforces the same law. Yet we have seen no such cases in which a federal court abstains.

Grace Ranch recognized that its argument for abstention largely turns on the possibility a federal court will have to make an *Erie* guess to decide whether legacy plaintiffs can obtain injunctive relief requiring remediation. At oral argument, it said that abstention would likely not be warranted in these types of cases once the state supreme court decides that issue. The only other federal district court to abstain from a section 30:16 case has made the same point. *Tureau*, 404 F. Supp. 3d at 1002. But as we have discussed, certification accommodates the federalism interests that favor having a state court decide important, unsettled questions of state law.

The concession that there would be little basis for abstention after the question of past violations is definitively resolved shows that the particular outcome of one of these remediation cases is independent of any other. They do not involve an integrated state regulatory scheme in which a federal court's tapping on one block in the Jenga tower might cause the whole thing to crumble. That fundamental *Burford* concern—that a federal court might undermine "a comprehensive scheme governing a matter of vital state interest . . . where uniform application of rules was important," *Sierra Club*, 112 F.3d at 796—is missing here. *See also NOPSI*, 491 U.S. at 362 (reversing an abstention ruling from our court because federal court review "would not disrupt the State's attempt *to ensure uniformity* in the treatment of an 'essentially local problem'" (emphasis added) (quoting *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 347 (1951)). As a result, abstention is not warranted.

No. 20-30224

\* \* \*

The motion to dismiss the appeal for lack of jurisdiction is DENIED. The remand order is REVERSED and this case is REMANDED for further proceedings.