# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 5, 2023

Lyle W. Cayce
Clerk

No. 22-20424

IN THE MATTER OF JUST ENERGY GROUP, INCORPORATED; ET AL

*Debtors*,

ELECTRIC RELIABILITY COUNCIL OF TEXAS, INCORPORATED; CALPINE CORPORATION; NRG ENERGY, INCORPORATED,

*Appellants*,

*versus*

JUST ENERGY TEXAS, L.P.; FULCRUM RETAIL ENERGY, L.L.C.; HUDSON ENERGY SERVICES, L.L.C.; JUST ENERGY TEXAS I CORPORATION; JUST ENERGY GROUP, INCORPORATED,

*Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-AP-4399

Before SOUTHWICK, GRAVES, and ENGELHARDT, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*:

This direct appeal from the bankruptcy court arises out of the soaring electricity prices charged during week-long winter storm Uri, which

No. 22-20424

incapacitated most of Texas's power-generating facilities. The bankruptcy court's refusal to abstain under *Burford* was in error. Accordingly, we VACATE and REMAND.

I.

Texas's Public Utility Regulatory Act ("PURA") "establish[es] a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities." Tex. Util. Code § 31.001(a); *accord* §§ 31.001(c), 39.001(a). Through PURA, the Texas legislature "created a pervasive regulatory scheme intended to be the exclusive means" of regulating electric utilities in Texas. *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004). The Public Utility Commission of Texas ("PUCT") is the agency charged with overseeing and implementing PURA. This includes ultimate authority over Texas's intrastate electric grid, *see* Tex. Util. Code § 39.151(d), which is independent of the two larger national grids.

The PUCT is required by statute to certify an independent organization to manage the wholesale electricity market and ensure the Texas electric grid's adequacy and reliability. Tex. Util. Code §§ 39.151(b), (d). It put appellant Electric Reliability Council of Texas, Inc. ("ERCOT") to the task. ERCOT Nodal Protocols § 1.2(1).[1] ERCOT determines market-clearing prices unless otherwise directed by the PUCT, its state regulator. 16 Tex. Admin. Code § 25.501(a). ERCOT is the sole buyer to each seller, and the sole seller to each buyer, of all energy in Texas. ERCOT Nodal Protocols § 1.2(4).

---

[1] All ERCOT Nodal Protocols in effect during winter storm Uri may be found here: https://www.ercot.com/files/docs/2021/08/18/February_1__2021_Nodal_Protocols.pdf.

No. 22-20424

According to the operative complaint, during winter storm Uri, which devastated Texas residents from February 13, 2021, through February 20, 2021, ERCOT and the PUCT allegedly "intervened in the market for wholesale electricity by setting prices [that were] orders of magnitude higher than what market forces would ordinarily produce." Energy supply plummeted as power plants were forced offline by the storm's impact. As demand for electricity outpaced supply, ERCOT ordered "load" to be "shed" to reduce strain on the power grid – *i.e.*, it ordered cuts in electricity consumption in the form of forced outages. In response, the PUCT issued orders (the "PUCT orders") directing ERCOT to ensure that load shed was accounted for in ERCOT's scarcity pricing signals.

The complaint alleges that these orders were "invalid" because they were not tied "to a fact-based analysis of the current market conditions" and failed to "explain the reasoning behind [the PUCT's] determination that energy prices should be set at the high-system-wide offer cap." It further provides that ERCOT, following the PUCT orders, "impermissibly" priced the energy at the maximum of $9,000 per megawatt hour ("MWh") – the cap – for more than eighty consecutive hours. ERCOT then allegedly left this price in place for 33 hours after the PUCT rescinded its orders. Once ERCOT allowed normal supply-and-demand forces to set the price of power on February 19, the trading price plummeted within one hour from $9,000/MWh to $27/MWh, later falling to less than $5/MWh.

Appellee Just Energy, a retail energy provider, purports that after the storm, ERCOT "floored" it with invoices totaling approximately $335 million for the operating days of February 13, 2021, through February 20, 2021. Lacking sufficient liquidity to satisfy the invoices on its own, Just Energy commenced bankruptcy proceedings in Canada and filed this Chapter 15 case in the United States Bankruptcy Court for the Southern District of

No. 22-20424

Texas, Houston Division.[2]  Under protest, Just Energy paid ERCOT the monies owed, disputing "no less than $274 million of the invoiced amounts."

Just Energy challenges its invoice obligations "because, among other things, the Invoices are based on the PUCT Orders, which themselves are unlawful under the [Administrative Procedure Act] and the [Public Utility Regulatory Act], and otherwise are inconsistent with the ERCOT Protocols and the [Standard Form Market Participant Agreement]."[3]  In the alternative, Just Energy contends that "even if the PUCT Orders are valid, [it] still has valid claims because ERCOT had no basis to apply the $9,000/MWh price after 11:55 p.m. on February 17, 2021."[4]  ERCOT moved to dismiss the complaint, arguing that each count "attempts to obtain judicial repricing of energy charges" and "implicate[s] the filed rate doctrine, the PUCT's rulemaking, ERCOT's sovereign immunity,[5] and *Burford* abstention."

---

[2] Just Energy's efforts to mitigate the consequences of the invoices included: "submitting filings to ERCOT and the PUCT both individually and through the Texas Energy Association of Marketers; lobbying the Texas state legislature; commencing restructuring proceedings for the second time in six months, *i.e.,* the Canadian Proceedings and Chapter 15 Cases; obtaining approval from both the Canadian Court and th[e] [Bankruptcy] Court to enter into a $125 million financing facility; and using a significant portion of the facility proceeds to pay ERCOT."

[3] The standard form market participant agreement "incorporates by reference, and requires compliance with ERCOT's nodal protocols (the "ERCOT Protocols")."

[4] This post-"11:55 p.m. on February-17, 2021" price contemplates the 33 hours that ERCOT left the $9,000/MWh price in place after the PUCT rescinded its orders mandating that rate.

[5] Whether ERCOT is entitled to sovereign immunity is an issue pending before the Texas Supreme Court in winter-storm-Uri-related litigation.  *See*, *e.g.*, *ERCOT v. Panda Power Generation Infrastructure Fund, LLC*, No. 22-0196 (Tex. Sept. 2, 2022); *CPS Energy v. ERCOT*, No. 22-0056 (Tex. Sept. 2, 2022).

At a hearing on the motion, the court dismissed all counts but four: (1) "Declaration Of Preference Under [Companies' Creditors Arrangement Act ("CCAA"), a Canadian law] (§ 36.1), [Bankruptcy and Insolvency Act ("BIA"), a Canadian law] (§ 95) – Invoice Obligations"; (2) "Declaration Of Preference Under CCAA (§ 36.1), BIA (§ 95) – Prepetition Transfers"; (3) "Recovering Proceeds If Transferred – CCAA (§ 36.1), BIA (§ 98)"; and (4) turnover under 11 U.S.C. § 542(a). The first three of these counts seek a declaratory judgment that ERCOT's Uri-related invoices and transfers paid to satisfy them are void as preferences because they were incurred or made in favor of ERCOT over Just Energy's other creditors. The fourth count alleges that property transferred to satisfy the invoices is subject to turnover. ERCOT timely appealed the court's partial dismissal.

## II.

This Court "review[s] an abstention ruling for abuse of discretion, but '[it] review[s] de novo whether the requirements of a particular abstention doctrine are satisfied.'" *Stratta v. Roe*, 961 F.3d 340, 356 (5th Cir. 2020) (applying this standard to *Burford* abstention) (quoting *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014)). "Because the exercise of discretion must fit within the specific limits prescribed by the particular abstention doctrine invoked, a court necessarily abuses its discretion when it abstains outside of the doctrine's strictures." *Id.* (quoting *Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697, 701 (5th Cir. 1999)) (alteration and internal quotation marks omitted).

At the hearing on ERCOT's motion to dismiss, the bankruptcy court stated that it would strike various language like, "subject to reduction only after a finding by the Court concerning a legally appropriate energy price per megawatt hour as proven by expert testimony, if appropriate, but in no event greater than the price per megawatt hour in effect after market forces took

effect." By striking this and similar language sprinkled throughout the complaint, the court concluded, without explanation, that "th[is] change solves the [abstention] problem." We disagree. Abstention under *Burford*[6] is proper because: (1) the doctrine applies in the bankruptcy context; and (2) four of the five *Burford* factors counsel in favor of abstention.

## A.  Section 1334(c) and *Burford*

The parties dispute whether *Burford* applies in the bankruptcy context. Just Energy argues that §1334(c)[7] subsumes *Burford* abstention, so *Burford* itself is inapplicable. Further, relying on our decision in *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 796 F.3d 520 (5th Cir. 2015), it argues that 28 U.S.C. § 1334(c) bars abstention where, as here, the case arises under Chapter 15. ERCOT disclaims bankruptcy-specific abstention under § 1334(c) and instead urges that abstention is proper under *Burford*, a separate abstention doctrine distinct from §1334(c).

We have already decided that §1334(c) does not subsume *Burford* abstention. *See Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 315 (5th Cir. 1993). In *Wilson*, a Chapter 11 bankruptcy case, we reviewed a district court's abstention under *Burford* as opposed to under §1334(c). *Id.* at 313 (observing district court's jurisdiction under §1334). There, we acknowledged bankruptcy abstention under §1334(c), yet applied *Burford*.

---

[6] *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

[7] The statute provides:

*Except with respect to a case under chapter 15 of title 11,* nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

§ 1334(c)(1) (emphasis added).

*Id.* at 315.  Had §1334(c) "subsumed" *Burford*, we would not have had appellate jurisdiction to review the court's decision, *see* 28 U.S.C. §1334(d) (stating that any decision to abstain or not to abstain made under §1334(c) is not reviewable by our court), nor would we have applied the five *Burford*-specific factors.  *See Wilson*, 8 F.3d at 313-16.  Our application of *Burford* in the § 1334 context demonstrates that the two types of abstention are distinct and stand alone. *See also Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697, 699-701 (5th Cir. 1999) (concluding that § 1334(d) did not bar appellate review where court abstained under *Burford*, not § 1334(c)).

Because § 1334(c) and *Burford* are independent abstention doctrines, Just Energy's reliance on *Firefighters'* is misplaced.  In *Firefighters'*, a Chapter 15 case, the question presented was whether the district court erred by permissibly abstaining under § 1334(c), 796 F.3d at 523-24, which applies "[e]xcept with respect to a case under chapter 15 of title 11."  § 1334(c)(1). There, we reversed the district court's decision to remand and held "that a district court cannot permissively abstain from exercising jurisdiction in proceedings related to Chapter 15 cases."  *Id.* at 528.  However, "[w]e limit[ed] [our] holding to only Chapter 15–related cases that are remanded *based on § 1334(c)(1)* permissive abstention."  *Id.* at 526 (emphasis added). We made no mention of abstention under *Burford* or other judicially-created abstention doctrines.  Here, in this Chapter 15 case, had ERCOT argued abstention under § 1334(c), *Firefighters'* might apply.  But it did not.  It exclusively argued abstention under *Burford*, so § 1334(c)(1)'s statutory bar in Chapter 15 cases is irrelevant here.

In any event, Just Energy holds out *Firefighters'* to mean that a court may never permissively abstain in the Chapter 15 context.  Then it argues that *Burford* is a permissive abstention doctrine, such that *Firefighters'* forecloses its application.  *Firefighters'* stood for no such thing.  Instead, *Firefighters'* applies only to abstention under § 1334(c) in a Chapter 15 case,

No. 22-20424

*Firefighters'*, 796 F.3d at 526, which, considering ERCOT's *Burford*-only abstention theory, is inapplicable here. Against this limited holding, we need not decide whether *Burford* is a mandatory or permissive abstention doctrine. We need only affirm our precedent establishing that: (1) abstention under § 1334(c) is distinct from abstention under *Burford*; and (2) *Burford* applies in the bankruptcy context. *See Wilson*, 8 F.3d at 313-16; *see also In re DPH Holdings Corp.*, 580 F. App'x 10, 13 (2d Cir. 2014) (affirming district court's *Burford* analysis in the bankruptcy context); Paul P. Daley & George W. Shuster, Jr., *Bankruptcy Court Jurisdiction*, 3 DePaul Bus. & Com. L.J. 383, 430 (2005) ("The *Rooker-Feldman* and *Burford* abstention doctrines are fairly rare in the bankruptcy context but do apply from time to time in cases where a final state court judgment or a preeminent state policy would be disrupted by an inconsistent federal court decision.").

## B. *Burford* Analysis

"Federal courts have a 'virtually unflagging obligation' to exercise [their] jurisdiction." *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 313 (5th Cir. 2021), *as revised* (Feb. 26, 2021) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). "As a result, 'abstention from the exercise of federal jurisdiction is the exception, not the rule.'" *Wilson*, 8 F.3d at 313 (quoting *Colo. River Water*, 424 U.S. at 813) (alteration omitted). Nevertheless, bankruptcy courts may abstain in the rare instances where the *Burford*-abstention doctrine permits. *See Wilson*, 8 F.3d at 313-14 (applying the *Burford*-abstention doctrine to bankruptcy case).

*Burford* abstention "allows federal courts to avoid entanglement with state efforts to implement important policy programs." *Grace Ranch*, 989 F.3d at 313. Under the doctrine, "[federal] courts have discretion to abstain from deciding unclear questions of state law arising in complex state administrative schemes when federal court intervention would undermine

8

uniform treatment of local issues." *Harrison*, 48 F.4th at 339 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 362 (1989) ("*NOPSI*"), and *Burford v. Sun Oil Co.*, 319 U.S. 315, 332 (1943)). "Where timely and adequate state-court review is available," the Supreme Court explained that "a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies" in two instances:

> (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or

> (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*NOPSI*, 491 U.S. at 361. So, "[t]he power to abstain under *Burford* charges courts with a careful balancing of state and federal interests, but one that 'only rarely favors abstention.'" *Grace Ranch*, 989 F.3d at 313 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)); *see also Aransas*, 775 F.3d at 653 ("*Burford* abstention is disfavored as an abdication of federal jurisdiction."). "In deciding whether to abstain under *Burford*, [federal] courts consider: (1) whether the plaintiff raises state or federal claims, (2) whether the case involves unsettled state law or detailed local facts, (3) the importance of the state's interest in the litigation, (4) the state's need for a coherent policy in the area, and (5) whether there is a special state forum for judicial review." *Harrison*, 48 F.4th at 339-40 (citing *Grace Ranch*, 989 F.3d at 313). Here, these factors weigh in favor of abstention.

### i. The first *Burford* factor

We begin with the first factor: whether the plaintiff raises state or federal claims. Just Energy's Chapter 15 claims are pleaded under Canadian and

federal law. While this first factor weighs against abstention, it does not settle the issue. *See Aransas*, 775 F.3d at 649; *see also Sierra Club v. City of San Antonio*, 112 F.3d 789, 794 (5th Cir. 1997) (abstaining on an Endangered Species Act claim).

### ii. The second *Burford* factor

Next: whether the case involves unsettled state law or detailed local facts. "*Burford* abstention does not so much turn on whether the plaintiff's cause of action is alleged under federal or state law, as it does on whether the plaintiff's claim may be in any way entangled in a skein of state law that must be untangled before the federal case can proceed." *Aransas*, 775 F.3d at 649-50 (quoting *City of San Antonio,* 112 F.3d at 795). So, "this [second] factor turns in part on whether the court will be forced to weigh competing local interests and mostly review an agency's decision in an area in which that agency is arguably an expert." *Id.* at 650 (citing *Wilson,* 8 F.3d at 315). "What would amount to [this Court's] review of state agency action in a state law framework would be grounds for abstention," *id.*, such as a "claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors." *Id.* (quoting *NOPSI,* 491 U.S. at 362).

"Following *Burford*'s logic, [this Court] ha[s] found abstention proper when [its] exercise of jurisdiction would involve the federal court in an open-ended 'fairness' inquiry into predominantly local matters or allow the court to second-guess the policy decisions of state regulators." *Grace Ranch*, 989 F.3d at 316. And so has the Supreme Court. In *Alabama Public Service Commission,* a railroad challenged a state commission order that denied it permission to discontinue certain routes. 341 U.S. 341, 342-43 (1951). The relevant, settled legal test required "balancing the loss to the railroad

from continued operation of [the affected routes] with the public need for that service." *Id.* at 347-48. Despite the legal framework being clear, the Supreme Court held abstention proper to avoid "the essentially local problem." *Id.* at 347, 349–50. What this shows, then, is that "*Burford* abstention is particularly appropriate where," as here, "'by proceeding the district court would have risked reaching a different answer than the state institutions with greater interest in and familiarity with such matters.'" *City of San Antonio*, 112 F.3d at 796 (quoting *Wilson*, 8 F.3d at 315).

Here, the merits of this case significantly implicate our "review [of] an agency's decision [namely, PUCT and ERCOT's decision] in an area in which that agency is arguably an expert." *Aransas*, 775 F.3d at 650. For example, Just Energy asks us to decide that: (1) either (a) the PUCT orders are invalid, or (b) ERCOT "had no basis to apply the $9,000/MWh price after 11:55 p.m. on Friday 17, 2021"; which would mean that (2) ERCOT misapplied its lawful authority; thus making (3) the invoices invalid; therefore (4) requiring ERCOT to return some or all of Just Energy's payments. But for us "to determine whether it was appropriate [for ERCOT] to disregard the Protocols," we, necessarily, would have to second guess ERCOT's decision making and authority during the unusual, emergency circumstances of winter storm Uri. That, in turn, "risk[s] reaching a different answer than the state institutions with greater interest in and familiarity with such matters." *See City of San Antonio*, 112 F.3d at 796. "This is precisely the sort of highly localized, specialized, judgmental, and perhaps partisan analysis" that begs abstention. *Wilson*, 8 F.3d at 315 (citing *Allstate Ins. Co. v. Sabbagh*, 603 F.2d 228, 231 n.2 (1st Cir. 1979) ("[W]e see no reason or policy which would exclude as a 'difficult question of state law' a question, requiring the most sophisticated analysis of complex facts, whether a rate meets a legal

standard.").[8]  Because Just Energy's claims (and, arguably, at least one of ERCOT's affirmative defenses) would be "entangled in a skein of state law that must be untangled before the federal [bankruptcy] case c[ould] proceed," *Aransas*, 775 F.3d at 649-50, this second factor weighs in favor of abstention.

### iii.  The third *Burford* factor

To the third factor: the importance of the state's interest in the litigation.  "[W]hen a state administrative scheme guards an 'over-all plan of regulation of vital interest to the general public' from federal interference," the state's interest is considered "paramount."  *Grace Ranch*, 989 F.3d at 316 (quoting *Burford*, 319 U.S. at 324).  Texas's electricity market is such a scheme.

Texas's interest in utility regulation and litigation is clear from the face of PURA.  Therein, the Texas legislature explained that PURA was "enacted to protect the public interest inherent in the rates and services of electric utilities" and its purpose is "to establish a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities."  Tex. Util. Code § 31.001(a); *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004).  It went on to say: "the public interest requires that rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace"; so, "[t]he development of a competitive wholesale electric market that allows for increased participation by electric utilities and certain nonutilities is in the public interest."  Tex. Util.

---

[8] As an aside, there are other unsettled state-law matters, including ERCOT's affirmative defenses that it is entitled to immunity and that the PUCT is an indispensable party with a right to intervene.

CODE § 31.001(c). Most importantly, to protect this public interest, the state legislature gave its own state agency, the PUCT, "'exclusive original jurisdiction over the rates, operations, and services of an electric utility' in certain geographic areas and exclusive appellate jurisdiction in others." *In re CenterPoint Energy Houston Elec., LLC*, 629 S.W.3d 149, 157 (Tex. 2021) (quoting TEX. UTIL. CODE § 32.001(a), (b)), *reh'g denied* (Oct. 15, 2021). That the state retains exclusive control and oversight of the market underscores its interest in this electricity-related litigation.

Moreover, "utility regulation 'is one of the most important of the functions traditionally associated with the police power of the States.'" *Wilson*, 8 F.3d at 315 (quoting *NOPSI,* 491 U.S. at 365) (alteration omitted). The Texas supreme court has repeatedly recognized Texas's interest in utility regulation and litigation and its protection of the electricity-related public interest. *See, e.g.*, *Oncor Elec. Delivery Co. LLC v. Chaparral Energy*, LLC, 546 S.W.3d 133, 139 (Tex. 2018); *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 489 (Tex. 2012) (observing electricity as a state interest); *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004). In *Oncor*, the court observed that "the statutory description of PURA as 'comprehensive' demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas." *Oncor*, 546 S.W.3d at 139 (quoting *In re Entergy Corp.*, 142 S.W.3d at 323). Again, with state-agency PUCT in charge of virtually all pertinent considerations regarding the electricity market in Texas, TEX. UTIL. CODE § 32.001(a), (b), Texas's interest in this litigation is paramount.

Finally, because the electricity grid is entirely intrastate, the management of the market is "a matter of particular importance to the state." *City of San Antonio*, 112 F.3d at 794 ("The defendants correctly note that both the aquifer and the endangered species are entirely intrastate, which makes

management of the aquifer a matter of peculiar importance to the state."). With the state interest so strong, this factor counsels in favor of abstention.

### iv. The fourth *Burford* factor

To the fourth factor: the state's need for a coherent policy in the area. "Although *Burford* abstention 'is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process or even in all cases where there is a potential for conflict with state regulatory law or policy.'" *Aransas*, 775 F.3d at 651 (quoting *NOPSI,* 491 U.S. at 362). The doctrine "is intended to avoid recurring and confusing federal intervention in an ongoing state scheme," *Wilson*, 8 F.3d at 315 (citing *Burford*, 319 U.S. at 332), or "worrisome meddling." *Grace Ranch*, 989 F.3d at 317.

Abstention is proper when a state regulatory scheme faces potential disruption, *cf. Grace Ranch*, 989 F.3d at 318, such that it would "crumble." *Harrison v. Young*, 48 F.4th 331, 340 (5th Cir. 2022). Such a scheme existed in *City of San Antonio*. In that case, the question before us was whether a federal court ruling on an Endangered Species Act claim would interfere with the "comprehensive regulatory scheme" through which Texas governed an aquifer. *City of San Antonio*, 112 F.3d at 794. The state agency that oversaw the aquifer controlled its water withdrawal through a permit system. *Id.* Like in *Burford*, where a federal court ruling concerning the drilling rights of one landowner would have conflicted with the need, "based on geologic realities, [for] each oil and gas field [to] be regulated as a unit for conservation purposes," *Burford*, 319 U.S. at 319, a federal court injunction regulating the aquifer's water use would have directly conflicted with the water withdrawals set by the state agency. *City of San Antonio*, at 794-95, 798. Because the federal court ruling would "necessarily affect[ ] other parties" within "a single

integrated system," abstention was proper. *Id.* at 794-95, 98.

Here, central to this case is "the type of 'complex state administrative processes' that *Burford* abstention aims to 'protect from undue federal interference,'" *Grace Ranch*, 989 F.3d at 317 (quoting *NOPSI*, 491 U.S. at 362) (alterations omitted), namely, Texas's wholesale electricity market. "The Legislature's description of PURA as 'comprehensive,' coupled with the fact that PURA regulates even the particulars of a utility's operations and accounting, demonstrates the statute's pervasiveness." *In re Entergy Corp.*, 142 S.W.3d at 323 (citing Tex. Util. Code § 14.202 (allowing PUCT to audit utilities as frequently as needed); § 36.056 (empowering PUCT to establish proper rates of depreciation, amortization, and depletion); § 38.004 (mandating clearance requirements for transmission and distribution lines)).[9] And, as in *City of San Antonio*, Just Energy's desired outcome jeopardizes Texas's pervasive, administrative electricity scheme.

Federal intervention necessarily affects all market participants. Should ERCOT repay monies for the energy Just Energy expended, it would have to allocate the debt owed to other market participants. ERCOT Protocols §§ 9.19(1)(e), 9.19.1(2)) (describing procedure to recover revenue due to a defaulting market participant's unpaid invoices from non-defaulting market participants owed revenue for their generation). That means that

---

[9] Just Energy's attempt to undermine Texas's utility scheme is unavailing. It contends that "this lawsuit arises out of a deregulated market that does not involve electric utilities over which the PUCT has exclusive jurisdiction," so, *Burford* may not apply. But Just Energy's characterization of the market misses the mark. This Court "do[es] not believe that *Burford* abstention is applicable only where the state regulatory scheme is fully in place." *City of San Antonio*, 112 F.3d at 796. Instead, *Burford* applies in the context of "a comprehensive scheme governing a matter of vital state interest, and one where uniform application of rules was important." *Id.* Here, Texas's comprehensive electricity scheme, guarded by uniform application of PURA, is certainly one to which *Burford* applies.

No. 22-20424

ERCOT would recoup the disputed $335 million from other market participants to remain revenue neutral and to ensure that energy-generating participants were paid. So, if Just Energy escapes its payment obligations, all other market participants will necessarily be affected, *see City of San Antonio,* 112 F.3d at 793–94, as they would financially bear the burden of an order in favor of Just Energy. This resulting domino effect is exactly the type of "worrisome" federal court interference with an interdependent administrative scheme that *Burford* seeks to prevent. *See Grace Ranch*, 989 F.3d at 317. Accordingly, the potential disruption of Texas's regulatory electricity scheme tips this fourth factor in favor of abstention.[10]

### v.  The fifth *Burford* factor

Finally, the last factor: whether there is a special state forum for judicial review. "To justify abstention, there must be a forum that offers 'timely and adequate state-court review.'" *Aransas Project*, 775 F.3d at 651-52 (quoting *NOPSI,* 491 U.S. at 361) (alteration omitted). That "[r]eview typically

---

[10] Just Energy argues that this proceeding is the "one-time affair" that we envisioned would not warrant abstention in *Wilson*. In *Wilson*, we found that while the power-distribution dispute "appear[ed] to be more of a one-time affair arising from a single landmark Louisiana decision, the history of rural cooperatives in the state reveals a long-running seesaw battle between nonregulation and regulation." *Wilson*, 8 F.3d at 315. Here, while the storm existed for a finite number of days, the dispute is not the "one-time affair" we referenced in *Wilson*. This scheme is not so different from that in *City of San Antonio*, where, after the aquifer suffered a severe drought, Sierra Club sued the city for "taking" endangered species due to the water withdrawals. *City of San Antonio*, 112 F.3d at 792. That historic drought was not a "one-time affair" where, "[a]s in *Burford,* there is a need for unified management and decision-making regarding the aquifer, since allowing one party to take water necessarily affects other parties." *Id.* at 794; *see also Burford*, 319 U.S. at 319 (concluding that entire, ongoing industry "must be regulated as a unit for conservation purposes"). Just like in *City of San Antonio*, ERCOT's decisions during Uri do not amount to an impermissible one-time affair where the entire industry will be necessarily affected by Just Energy's possible recoupment of funds.

16

includes the ability to appeal agency orders to a state trial court, with available state appellate review, and such review may include initial review by the agency." *Id.* at 652. "[R]eview should be more than a fact finding venture with only the remote possibility of enforcement." *Id.* (citation omitted).

Just Energy says that its *bankruptcy* claims cannot be adjudicated in an administrative proceeding before the PUCT or before a Texas state court. So, it says that the bankruptcy court is the proper forum to "examine whether it was appropriate to disregard the [ERCOT] Protocols, and to do so through the PUCT Orders under the Texas APA and PURA." But behind the guise of Just Energy's bankruptcy action is its challenge to ERCOT's pricing decision and invoices. Texas law mandates that those types of challenges – *i.e.*, challenges to invoices and regulatory actions – must be filed with ERCOT in the first instance, with a right of appeal to the PUCT, and then to Travis County district court. *See, e.g.,* ERCOT PROTOCOLS §§ 6.3(7), 9.2.5(1), 9.5.6(1), 9.14.2, 9.14.4, 9.5.5, 20.1(1, 20.10.1, TEX. UTIL. CODE § § 32.001(a), 39.151(d-4)(6), 11.07(a), 15.001; 16 TEX. ADMIN. CODE § 22.251(b), (c), 2001.176(b)(1)).

Texas selected the Travis County district court "[t]o prevent the confusion of multiple review of the same general issues." *Burford*, 319 U.S. at 326. Here, the root issue falls within the exclusive jurisdiction of the state court. The only way that Just Energy can get the relief it seeks – at least $274 million of the $335 million paid – is for a court to answer the question central to Just Energy's case: Did ERCOT charge a lawful filed rate calculated in accordance with market-based protocols? If the answer is yes, the $335 million dollar invoice stands, and no money is returned to Just Energy. If the answer is no, Just Energy can claw black some or all of its money through its bankruptcy action. Only one court is permitted to answer Just Energy's $335-million-dollar question: Travis County district court. TEX. GOV'T

CODE § 2001.176(b)(1); TEX. UTIL. CODE §§ 11.007(a), 15.001.

That state court is well equipped to adjudicate Just Energy and ERCOT's dispute. It routinely reviews whether the PUCT fails to follow the language of its own regulations, *see Pub. Util. Comm'n of Tex. v. Gulf States Utilities Co.*, 809 S.W.2d 201, 207 (Tex. 1991) (collecting cases), or whether an affiliated independent organization – *i.e.*, ERCOT – complied with the PUCT's rules and orders. *See* TEX. UTIL. CODE § 39.151(d-4)(5). Should the court decide that the invoices are unlawful, such that the rates are excessive, it may award recovery against the PUCT. TEX. UTIL. CODE § 15.003. Texas's legal scheme explicitly addresses the question Just Energy seeks to have answered. So, for this Court to inject itself into the matter would be exactly the type of interference *Burford* abstention exists to avoid. Because the answer central to Just Energy's claims can only be found in a specific state forum, this last factor weighs in favor of abstention.[11]

So, four of the five factors favor abstention. Just Energy fails to cite any caselaw where the scoreboard is this lopsided in favor of abstention, yet *Burford* was inapplicable. *Cf. Grace Ranch*, 989 F.3d at 319 (holding that abstention was not warranted when the first three factors favored abstention). Accordingly, the district court abused its discretion in declining to abstain.

---

[11] To be sure, we do not conclude that the Travis County district court is the appropriate court to handle Just Energy's bankruptcy proceeding. Rather, it is the appropriate court to consider the merits of Just Energy's claims: *i.e.*, whether the ERCOT invoices stand. Without this answer, the bankruptcy proceedings cannot move forward. Because this merits question may only be decided by the Travis County district court, the bankruptcy court must abstain from answering it.

No. 22-20424

### III. Conclusion

Accordingly, we VACATE the bankruptcy court's order and REMAND with instructions to determine the appropriate trajectory of this case after abstention.